**PACIFIC DUNLOP HOLDINGS INCORPORATED, a Delaware Corporation, Plaintiff–Appellant,**

**v.**

**ALLEN & COMPANY INCORPORATED, a New York Corporation, Defendant–Appellee.**

**No. 91–2346.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1992.

Decided May 7, 1993.

Peter J. Meyer, Michael J. Koenigsknecht (argued), Andrew C. Spiropoulos, John W. Raihala, Gardner, Carton & Douglas, Chicago, IL, for plaintiff-appellant.

Derke J. Price, Nick J. DiGiovanni, Lord, Bissell & Brook, Chicago, IL, James C. McMillin (argued), Kevin J. Toner, Werbel, McMillin & Carnelutti, New York City, for defendant-appellee.

Before BAUER, Chief Judge, MANION, Circuit Judge, and MOODY, District Judge.*,**

* Honorable James T. Moody, District Judge for the Northern District of Indiana, is sitting by designation.

** This opinion has been circulated pursuant to Circuit Rule 40(f) among the judges of this court in regular active service. A majority did not favor a rehearing *en banc* (Circuit Judge Kenneth F. Ripple voted to rehear *en banc* ) on the question of a conflict with *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682 (3d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).

MANION, Circuit Judge.

This case presents a single issue of law: the scope of section 12(2) of the Securities Act of 1933 (1933 Act), 48 Stat. 74, as amended, 15 U.S.C. § 77*l*, as it involves civil fraud in a security transaction.[1] On October 1, 1987 Pacific Dunlop Holdings Inc. ("Pacific") entered into a stock purchase agreement with GNB Holdings Inc. ("GNB") and its other shareholders, Allen & Company Incorporated ("Allen"), Daniel E. Heffernan and thirteen other individuals. The defendants in this case, Allen, an investment banking firm, owned approximately 20 percent of the stock, and Heffernan owned 6.7 percent.[2] Neither defendant is considered a management shareholder. A few months earlier GNB filed a registration statement with the Securities Exchange Commission in order to make an initial public offering of 5,800,000 shares of common stock, including some stock owned by Heffernan. No securities were ever sold pursuant to the registration statement. GNB abandoned the public offering once it entered into the private stock purchase agreement with Pacific, although the agreement did warrant and represent the truthfulness of the information in the registration statement.

Pacific's purchase of GNB brought its ownership to approximately 92 percent of the outstanding common stock for a total cost of $670 million.[3] GNB is a holding company whose subsidiaries engage in the manufacture and sale of industrial and lead acid batteries and the recovery, smelting and sale of lead. In pertinent part the stock purchase agreement represented that GNB and its subsidiaries were in compliance with environmental laws and regulations, were not subject to any pending or threatened governmental investigation and had disclosed all liabilities or obligations. But in reality, GNB was exposed to and now faces extensive environmental claims, liabilities regarding a government services contract, and occupational disease claims. In part to avoid the liabilities and to expunge itself from the plethora of problems GNB faces, Pacific seeks to rescind the deal. Allen is not interested; it prefers to keep the money rather than regain the stock.

Pacific's complaint asserts that Allen omitted material facts that rendered its representations in the stock purchase agreement false and misleading, constituting fraud in violation of the Securities Act, section 12(2), and the Illinois Securities laws.[4] Allen moved to dismiss the complaint for failing to state a claim upon which relief could be granted. The district court summarily dismissed the complaint, relying upon the Third Circuit opinion in *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682 (3d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).

Section 12(2) prohibits fraud in a prospectus. However, there are many possible interpretations of "prospectus." Section 2(10) contains an explicit definition of prospectus; however, this definition may not control if the context of the securities laws and their legislative history require otherwise. Pacific wants the section 2(10) definition to apply in this case. Because of its broad wording, the definition of prospectus would include the

1. The 1933 Act is codified in 15 U.S.C. §§ 77a *et seq.* The citations in the opinion will refer to the more familiar sections of the 1933 Act, rather than to the particular sections of the United States Code.

2. Pacific Dunlop originally brought this appeal against Allen and Heffernan. During the pendency of the appeal Pacific and Heffernan agreed to settle their dispute. On February 18, 1993 we granted Pacific's motion to dismiss Heffernan pursuant to Fed.R.App.P. 42(b). Allen remains as defendant-appellee.

3. After the purchase GNB's name was changed to Pacific Dunlop GNB Corporation, the sole common shareholder of GNB Incorporated, which in turn maintains a wholly-owned subsidiary, GNB Industrial Battery Company.

4. This case is among several involving these transactions. Heffernan, as a former director of GNB, has sued Pacific for indemnification. *See Heffernan v. Pacific Dunlop GNB Corp.*, 965 F.2d 369 (7th Cir.1992). Pacific separately sued the management shareholders pursuant to section 10(b) of the 1934 Act. *See Pacific Dunlop Holdings Inc. v. Robert F. Barosh*, No. 91-C-0002, 1991 WL 348494 (N.D.Ill.1991). Two of the management shareholders, in turn, have sued Pacific for breach of contract because Pacific has not paid the final balance due of nearly $23 million. *See Stanley N. Gaines v. Pacific Dunlop Holdings Inc.*, No. 91-C-0025 (N.D.Ill.1991).

stock purchase agreement and provide Pacific relief. Allen, however, wants a more narrow definition, arguing section 12(2) does not apply to secondary market transactions. Case law provides authority on each side of the dispute. Ultimately, we conclude that Pacific has a cause of action, based on the text of the 1933 Act, its legislative history, and the impact of section 12(2) on similar fraud provisions in the security laws.

### I. Conflict of Authority

The 1933 Act was passed by Congress during an era in our country's history marked by grave concern over the securities market. Since that time numerous district courts have applied section 12(2) of the 1933 Act to similar facts yielding different results. *E.g., Bank of Denver v. Southeastern Capital Group, Inc.,* 763 F.Supp. 1552, 1558–59 (D.Colo.1991) (and cases cited therein); *see* 17A J. William Hicks, *Civil Liabilities: Enforcement and Litigation Under the 1933 Act,* § 6.01, pp. 12–34 (1992). In *Ballay,* which the district court relied on in this case, investors had purchased outstanding securities of Wickes Corporation from stockbrokers employed by Legg Mason. 925 F.2d at 684. A jury found for the investors and against the brokerage firm for oral misrepresentations concerning the actual value of the stock. *Id.* at 686. The Third Circuit reversed, holding that section 12(2) applies only to initial distributions, not to after-market trading, based on "the language and legislative history of section 12(2), as well as its relationships to sections 17(a) and 10(b) within the scheme of the 1933 and 1934 Acts." *Id.* at 693.[5] *Cf.,* Louis Loss, Commentary, *The Assault on Securities Act Section 12(2),* 105 Harv.L.Rev., 908 (1992).

Although the Supreme Court has not specifically addressed whether section 12(2) applies solely to initial offerings, the Supreme Court assumed to the contrary in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). In *Wilko,* investors sued their brokerage firm, Hayden, Stone & Co., pursuant to section 12(2) for misrepresentations concerning the value of the common stock of Air Associates, Incorporated (based on a merger contract with Borg Warner Corporation), and for omitting to state that an Air Associates director was also selling his stock. *Id.* at 429, 74 S.Ct. at 183–84. The brokerage firm moved to stay the district court proceedings pending arbitration in accordance with their margin agreements with the investors. The district court denied the motion, concluding that arbitration was contrary to the remedies afforded by the 1933 Act. *Wilko v. Swan,* 107 F.Supp. 75, 79 (1952). The Second Circuit reversed, holding that the congressional policies under the United States Arbitration Act permitted arbitration of the dispute, overriding the 1933 Act. *Wilko v. Swan,* 201 F.2d 439, 445 (1953). The Supreme Court reversed the Second Circuit, holding that an arbitration agreement could not waive the provisions of section 12(2) of the 1933 Act, notwithstanding the Arbitration Act. *Wilko v. Swan,* 346 U.S. at 438, 74 S.Ct. at 188–89.

Although in *Wilko* the arbitration provision of the margin agreements between the investors and their brokerage firm was the only issue raised in the motion to dismiss the complaint,[6] the posture of the case included the facts that no registration statement had been filed, and the securities involved common stock on the after-market, not an initial

5. A primary distribution is a public offering made on behalf of the issuer. The proceeds realized from the offering will ... be available to the issuer to be used for corporate purposes. A secondary distribution broadly defined is one made on behalf of some person or persons other than the issuer.

   3A Harold S. Bloomenthal, *Securities and Federal Corporate Law,* § 6.03, p. 4 (1988). "Trading in securities involves transactions by someone other than an issuer; it assumes that the securities are presently outstanding and are being bought and sold in the organized securities market." *Id.* at § 6.04, p. 5.

6. On remand from the Supreme Court, the jury found the securities were exempted from the registration requirements. *Wilko v. Swan,* 127 F.Supp. 55, 57 (1955). The district court granted a new trial on the section 12(2) claims and rejected the brokerage firm's argument that the 1933 Act was not intended to apply to transactions on a national securities exchange. *Id.* Thus, the district court's interpretation of the Supreme Court case in *Wilko* is consistent with the conclusion we reach today.

offering. On these facts the Supreme Court stated:

> In response to a Presidential message urging that there be added to the ancient rule of *caveat emptor* the further doctrine of "let the seller also beware," Congress passed the Securities Act of 1933. Designed to protect investors, the Act requires issuers, underwriters, and *dealers* to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale. To effectuate this policy, § 12(2) created a special right to recover for misrepresentation which differs substantially from the common-law action in that the seller is made to assume the burden of proving lack of scienter.

*Wilko,* 346 U.S. at 430–31, 74 S.Ct. at 184–85 (emphasis added; footnotes omitted). Although dicta, the Supreme Court's recognition that section 12(2) applies to dealers [7] stands in opposition to the Third Circuit's holding in *Ballay,* 925 F.2d 682. This reasoning survived *Rodriguez De Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).[8]

Also contrary to the Third Circuit's holding in *Ballay* stands the Tenth Circuit's opinion in *Woodward v. Wright,* 266 F.2d 108 (1959). Wright had assigned the majority of his interest in an oil and gas lease to Forrest and Hanna, who decided to sell the lease to Woodward and some fellow businessmen. The district court found that the sellers had mailed a prospectus to the purchasers that contained material false statements, but that the transaction did not violate sections 12(1)–(2). *Id.* at 112. The Tenth Circuit first ruled that the oil and gas lease involved a security sale within the meaning of the 1933 Act. *Id.* at 114. Second, "[t]he whole transaction was a closely knit arrangement among friends and acquaintances, and was conducted on a personal basis. All of the purchasers apparently entered into the transaction with sophisticated discernment." *Id.* at 115 (emphasis and citation omitted). Thus, the court concluded that the single transaction was not a public offering and did not violate section 12(1) [9] by failing to file a registration statement. Finally, on the question of section 12(2) liability, the Tenth Circuit reversed the district court in favor of the purchasers.

> [T]he [s]ection [12(2) ] remedy is applicable to the sale of all securities (with exceptions not here material) whether exempt from the registration requirements or not, or whether the sellers were issuers for the purpose of public offering or not.

*Woodward,* 266 F.2d at 116. As in the *Wilko* decision, in *Woodward* neither the parties nor the court directly addressed whether section 12(2) applied solely to initial offerings. Nevertheless, the Tenth Circuit upheld a section 12(2) claim in a case where no registration statement was required and the sale of the securities involved a secondary market transaction.[10] The Tenth Circuit thus assumes a different application of section 12(2) than that required of the Third Circuit in *Ballay.*

Likewise, the First Circuit has allowed a section 12(2) claim involving a secondary market transaction. In *Cady v. Murphy,* 113 F.2d 988, 989 (1st Cir.), *cert. denied,* 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940), a securities broker had persuaded Murphy to purchase voting trust certificates of South American Utilities Corporation, which were part of a block of shares that had previously been held by E.E. Smith & Company. The

7. The 1933 Act defines a "dealer" to include a broker. Section 2(12). Contrary to the *Wilko* and *Ballay* decisions which involved brokers, the present case involves a direct sale between the stock owners and purchasers pursuant to a stock purchase agreement. We do not need to address any question under section 12(2) as to who may be liable; rather, we need only address whether the scope of section 12(2) liability includes the type of securities sold in this case.

8. The Supreme Court in *Rodriguez De Quijas* overruled *Wilko;* parties may now agree to arbitrate claims under the Securities Act, notwithstanding the waiver provision of section 14. *Rodriguez De Quijas,* however, did not comment on section 12(2).

9. The court identified sections 12(1–2) as sections 9(1–2), reflecting the numerical change of the 1954 amendments. *Woodward,* 266 F.2d at 111.

10. The Tenth Circuit has since followed its *Woodward* decision, applying the same analysis to similar facts. *Gilbert v. Nixon,* 429 F.2d 348, 356–59 (1970).

court noted indirectly that the sale was not required to be registered, and held that section 12(2) imposed liability "for misrepresentations not only upon principals, but also upon brokers when selling securities owned by other persons." *Id.*, 113 F.2d at 990. As in the *Wilko* and *Woodward* decisions, neither the parties nor the court directly addressed whether section 12(2) applied solely to initial offerings. But in *Cady* the First Circuit did uphold a section 12(2) claim in a case where no registration statement was required and the sale of the securities involved outstanding stock. Thus, the Third Circuit's opinion in *Ballay* stands in opposition to what the First and Tenth Circuits have already permitted. For the reasons which follow, we depart from the Third Circuit and hold that section 12(2) includes secondary market transactions.

## II. The Text of the 1933 Act

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). Section 12 states that any person who

> (1) offers or sells a security in violation of section 5, or
>
> (2) offers or sells a security (whether or not exempted by the provisions of section 3, other than paragraph (2) of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
>
> shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

The parties admit that their stock purchase agreement is not exempted by the provisions of section 3(a)(2) and that they have availed themselves of means and instruments in interstate commerce and the mails. The parties would leave for trial whether the stock purchase agreement actually contains a misstatement or omission of material fact. For purposes of the motion to dismiss, the parties only dispute whether their stock purchase agreement was "by means of a prospectus or oral communication" and whether Congress intended that the 1933 Act should apply in the present case.[11]

Specifically, Pacific argues that the stock purchase agreement in this case falls under the definition of a prospectus in section 2(10) of the 1933 Act because the stock purchase agreement was a communication of an offer to sell securities. Allen responds that the agreement does not fit within the definition. It argues that section 2 begins with the phrase "When used in this title, unless the context otherwise requires . . . ," and that the context of section 12(2) requires a different definition than section 2(10). Finally, Allen argues that the legislative history illustrates that Congress intended the civil fraud remedy of section 12(2) to encompass only initial offerings.

### A. *The section 2(10) definition of prospectus.*

Section 2 of the 1933 Act defines certain terms of art ("prospectus", "sale", "offer" and "security") very broadly. A prospectus in-

11. Allen also moved the district court to dismiss the complaint for failure to plead fraud with particularity, failure to allege Allen itself (rather than the corporation and the management shareholders) made any false representations in the stock purchase agreement and failure to allege the plaintiffs' reasonable efforts in bringing the action within the statute of limitations period. Allen may again raise these arguments before the district court. They were neither briefed nor argued to this court, and we take no position on their merit.

cludes a variety of communications, and specifically exempts others. The prospectus also must involve the offer or sale of a security. We begin with a look at each of these key definitions.

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security,....

* * * * * *

(3) The term "sale" or "sell" shall include every contract of sale or disposition of a security or interest in a security, for value. The term "offer to sell", "offer for sale", or "offer" shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value....

* * * * * *

(10) The term "prospectus" means any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security; except that

(a) a communication sent or given after the effective date of the registration statement (other than a prospectus permitted under subsection (b) of section 10) shall not be deemed a prospectus if it is proved that prior to or at the same time with such communication a written prospectus meeting the requirements of subsection (a) of section 10 at the time of such communication was sent or given to the person to whom the communication was made, and

(b) a notice, circular, advertisement, letter, or communication in respect of a security shall not be deemed to be a prospectus if it states from whom a written prospectus meeting the requirements of section 10 may be obtained and, in addition, does no more than identify the security, state the price thereof, state by whom orders will be executed, and contain such other information as the Commission, by rules or regulations deemed necessary or appropriate in the public interest and for the protection of investors, and subject to such terms and conditions as may be prescribed therein, may permit.

Without citation, Allen argues that the stock purchase agreement in this case does not fit within the definition of prospectus in section 2(10). In its brief Allen claims that "A privately negotiated contract is simply not a communication, such as those listed in section 2(10), which is designed to entice buyers, ... [nor does it] 'confirm[ ] the sale of any security.'" From Allen's standpoint, this is an optimistically narrow reading. Pacific properly cites *Byrnes v. Faulkner, Dawkins & Sullivan,* the breadth of which underscores the section 2(10) definition:

> In 1941, ... the SEC's general counsel issued an opinion to the effect that the term "prospectus" included "within its meaning an ordinary confirmation," as well as "every kind of written communication ... which constitutes a contract of sale or disposition of a security for value." Securities Act Release No. 2623 (1941), *reprinted in* 11 Fed.Reg. 10964 (1946). A 1954 statutory amendment incorporated this opinion in substance into the language of Section 2(10) of the 1933 Act as quoted above; the congressional reports explicitly referred to the 1941 opinion and stated that the amendment was adopted in order to avoid any implied repeal of "settled interpretations" of the original text of Section 2(10). S.Rep. No. 1036 at 12, H.R.Rep. No. 1542 at 21, 83d Cong., 2d Sess. (1954), U.S.C.C.A.N. 1954, p. 2973.

550 F.2d 1303, 1309 (2d Cir.1977). A prospectus thus includes a contract of sale or any other kind of written communication that disposes of a security. The stock purchase agreement in this case evidences that Allen would sell and that Pacific would purchase over six million shares of stock. And the agreement represents information given and received by all parties which led to this present dispute. Thus, Allen cannot seriously

deny that the stock purchase agreement was a written communication involving the sale of securities. *See Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1225 (7th Cir.1980) (finding commercial paper reports constituted a prospectus), *cert. den. sub nom.*, 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981); *accord Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1390 (7th Cir.1990) (a prospectus includes "materially incorrect or misleading selling literature."), *cert. denied*, — U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991).

Because the 1933 Act contains only one explicit definition of prospectus, one conclusion would be that the term prospectus means the same throughout the 1933 Act. This would boost Pacific's argument that section 12(2) incorporates the section 2(10) definition. However, if the 1933 Act contemplates more than one definition of prospectus, Pacific's argument of *whether* a certain definition applies is weakened by asking *which* definition applies. *See Ballay,* 925 F.2d at 688–89. A comparison with the definition of "registration statement" helps to provide guidance. The 1933 Act primarily deals with three areas: the registration statement, the prospectus, and fraud. The section defining registration statement (Section 2(8)) incorporates section 6 as follows:

> The term "registration statement" means the statement provided for in section 6, and includes any amendment thereto and any report, document, or memorandum filed as part of such statement or incorporated therein by reference.

But section 2(10), which defines "prospectus," does not confine itself to "the statement provided for in section 10," or other such language. This permits the inference that section 10 involves only one type of prospectus. The inference finds support in the definitional section of prospectus, because certain communications are exempted from the term "prospectus" where the communication includes the delivery of a section 10 prospectus or states from whom such a document may be obtained. Section 2(10)(a–b). Thus, certain communications could be classified as prospectuses under section 2(10) without complying with section 10.

Section 10(d) provides the best indication that no single definition similarly applies throughout the 1933 Act. In this section the Commission is given the

> authority to classify prospectuses [under section 10] according to the nature and circumstances of their use or the nature of the security, issue, issuer, or otherwise, and, by rules and regulations and subject to such terms and conditions as it shall specify therein, to prescribe as to each class the form and contents which it may find appropriate and consistent with the public interest and the protection of investors.

Thus, the 1933 Act contemplates many definitions of a prospectus. Section 2(10) gives a single, broad definition; section 10(a) involves an isolated, distinct document—a prospectus within a prospectus; section 10(d) gives the Commission authority to classify many. *See* 17 C.F.R. §§ 230.134, 230.153, 230.420–230.432. Which definition did Congress contemplate in section 12(2)? The definitional section 2 begins with the phrase "When used in this title, unless the *context* otherwise requires...." (Emphasis added.) This leads to an analysis of the context of a prospectus and whether section 12(2) requires a definition of prospectus contrary to the broad definition of section 2(10).

*B. The context of prospectus.*

In *Rowland v. California Men's Colony,* — U.S. ——, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993), an inmate association sued various prison officials under 42 U.S.C. § 1983. The issue was whether an association fell under the definition of person in 28 U.S.C. § 1915(a), in order to proceed *in forma pauperis.* The Court focused on the definition of "person" in the Dictionary Act, 1 U.S.C. § 1. That section began with the phrase: "[i]n determining the meaning of any Act of Congress, *unless the context indicates otherwise.*" *Rowland,* — U.S. at ——, 113 S.Ct. at 720 (emphasis added). Although the present case involves the word "requires" rather than "indicates," the Court's discussion of the word "context" is particularly instructive.

> "Context" here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional

Acts, and this is simply an instance of the word's ordinary meaning: "[t]he part or parts of a discourse preceding or following a 'text' or passage or a word, or so intimately associated with it as to throw light upon its meaning." Webster's New International Dictionary 576 (2d ed. 1942). While "context" can carry a secondary meaning of "[a]ssociated surroundings, whether material or mental," *ibid.*, we doubt that the broader sense applies here. The Dictionary Act uses "context" to give an instruction about how to "determin[e] the meaning of a[n] Act of Congress," a purpose suggesting the primary sense. If Congress had meant to point further afield, as to legislative history, for example, it would have been natural to use a more spacious phrase, like "evidence of congressional intent," in place of "context."

*Id.*, — U.S. at —, 113 S.Ct. at 720. The 1933 Act does not define "context." Pacific argues that the context of prospectus when used in section 12(2) concerns only the language in that particular section. *See American Bankers Ass'n v. S.E.C.*, 804 F.2d 739, 753–55 (D.C.Cir.1986). As a general rule, "[t]he context of a particular sentence or clause in a statute ... comprises those parts of the text which immediately precede and follow it." *Black's Law Dictionary* 320 (6th ed. 1990). Allen, on the other hand, argues that the context of prospectus concerns the scope of the entire 1933 Act, including its legislative history. If prospectus is defined in such a broad context, Allen asserts that the totality of the 1933 Act and its legislative history would demonstrate that section 12(2) was not intended to include secondary market transactions. An overview of the 1933 Act will help provide guidance.

The 1933 Act consists of twenty-six sections and two schedules. Section 2 merely defines the majority of important terms. Section 3 lists specific exemptions to which the Act will generally not apply, including securities classified as reserved, and securities issued by the federal or state governments, banks, savings and loan associations, non-profit organizations, certain railroad trusts, bankruptcy certificates and insurance policies. Section 4 exempts certain transactions from the requirement that a registration statement be effective before selling the securities. Section 5 details the prohibitions where a registration statement has not become effective. Section 7 states the information required in the registration statement and accompanying schedules. Section 10 details the information required in a prospectus. Section 11 provides for civil liabilities for false information in any part of the registration statement, describing who may be sued, the shifting burdens of proof, the standard of negligence and the calculation of damages. The section we are most concerned with here, section 12, quoted *supra*, provides for civil liability for selling a security without an effective registration statement or for false information in a "prospectus or oral communication." Section 13 provides specific statute of limitations periods for the civil liability provisions of sections 11 and 12. Section 17 is a catch-all provision that makes fraudulent interstate security transactions unlawful. Section 24 makes a willful violation of any of the foregoing sections a criminal matter, involving a fine of not more than $10,000 or imprisonment of not more than five years, or both.

The Third Circuit found the structure of the 1933 Act particularly instructive:

> Section 12(2) follows section 11 and section 12(1), which govern the registration of securities and create civil liability for sales of unregistered securities, respectively, and appears before section 13, which provides the statute of limitation for both sections 11 and 12. All of these sections deal with initial distributions. 15 U.S.C. §§ 77k, 77*l* (1). Congress' placement of section 12(2) squarely among the 1933 Act provisions concerned solely with initial distributions of securities indicates that it designed section 12(2) to protect buyers of initial offers against fraud and misrepresentation.[12]

12. The Third Circuit states that sections 11, 12(1) and 13 are "concerned solely with initial distributions of securities." *Ballay*, 925 F.2d at 691. This is not "solely" the case. *See, e.g., Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1307 (2d Cir.1977) (involving a registered secondary distribution). Sections 11 and 12(1) reference registration statements. They do not even

*Ballay,* 925 F.2d at 691. The 1933 Act is primarily concerned with only two documents—registration statements and prospectuses. They are dealt with in that order: Section 2 defines a registration statement (2(8)) and then a prospectus (2(10)). Section 6 details the registration statement and section 10 the prospectus. Section 11 applies to fraud in the registration statement and section 12 applies to fraud in the prospectus. The Third Circuit focused on this structure as the "context [that] otherwise requires" a prospectus to be confined to initial distributions. Section 2. We do not read the word "context" as broadly. Prior to *Ballay,* neither had the Third Circuit. *Ruefenacht v. O'Halloran,* 737 F.2d 320, 330–32 (3d Cir. 1984), *aff'd sub nom.* 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1984). *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 200, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976).

> The ascertainment of congressional intent with respect to the scope of liability created *by a particular section* of the Securities Act must rest primarily on the language of *that section.* The broad remedial goals of the Securities Act are insufficient justification for interpreting a specific provision "more broadly than its language and statutory scheme reasonably permit." We must assume that Congress meant what it said.

*Pinter v. Dahl,* 486 U.S. 622, 653, 108 S.Ct. 2063, 2081–82, 100 L.Ed.2d 658 (1988) (emphasis added; citations omitted). The structure of the entire 1933 Act cannot qualify as the context in which a prospectus should be defined. Such an approach would result in an entirely new definition in the place of section 2(10). Also, nothing in the structure of the 1933 Act *requires* a different definition of prospectus in section 12(2) than that contained in section 2(10). Thus, we confine our inquiry of the context of the word "prospectus" to the language of section 12. *Rowland,* — U.S. at —, 113 S.Ct. at 720.

Section 12(1) of the Act specifically applies to a person who offers or sells a security in violation of section 5. In pertinent part, section 5 states that

> (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
>
> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; ...
>
> (c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer or to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security....

By combining sections 5 and 12(1), the general rule is that a person may not offer or sell a security by means of "any prospectus or otherwise" without filing a registration statement. *See A.C. Frost & Co. v. Coeur D'Alene Mines Corp.,* 312 U.S. 38, 41–42, 61 S.Ct. 414, 416, 85 L.Ed. 500 (1941). This would imply that a prospectus cannot exist without a registration statement. But this implication is not necessarily true.

The exemptions to section 5 include approximately twelve classes of securities listed in section 3 and the six classes of transactions listed in section 4. If a security transaction is exempted under sections 3 or 4, a person will not incur section 12(1) liability pursuant to section 5. The question is whether these same exemptions apply to sec-

mention language such as "initial" or "secondary". For example, registration statements are required in public offerings; certain private offerings are exempt. Section 4(2). The public/private and initial/secondary are two entirely different questions. As a general rule, a seller that publicly offers stock must register the security, whether the sale involves an initial issue or a secondary market transaction. Likewise, a qualified private security sale would be exempt from sections 5 and 12(1), whether the sale involved an initial issue or a secondary market sale. Telling the practical difference between the two can also prove difficult. *Barnes v. Osofsky,* 373 F.2d 269, 272–73 (2d Cir.1967). With respect to issuers, underwriters or dealers, all securities must be registered, again notwithstanding whether the sale involves an initial issue or a secondary market transaction. Section 4(1).

tion 12(2).[13] Section 3 begins with the phrase "Except as hereinafter expressly provided." Section 12(2) expressly provides that fraud in a prospectus is actionable, "whether or not exempted by the provisions of section 3," unless the security falls under section 3(a)(2) (dealing only with securities issued by the federal and state governments and banks). Thus, only one of twelve classifications of securities exempted under section 3 is not actionable for a violation under section 12(2). As a result, section 12(2) applies to a much broader range of securities than sections 5 or 12(1). Section 4 begins with the phrase "The provisions of section 5 shall not apply to...." If Congress had wanted the section 4 exemptions to apply to sections 12(1) and 12(2) alike, Congress simply could have begun section 4 by stating "The provisions of *sections 5 and 12* shall not apply to...." The courts have consistently held that the section 4 exemptions do not apply to section 12(2). *Wright v. National Warranty Co., L.P.,* 953 F.2d 256, 262 (6th Cir.1992) (the securities were exempt from registration requirements pursuant to section 4(2), yet the case was remanded based on section 12(2)); *Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1032 (5th Cir.1991); *Nor-Tex Agencies, Inc. v. Jones,* 482 F.2d 1093, 1099 (5th Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974); *Hill York Corp. v. American Int'l Franchises, Inc.,* 448 F.2d 680, 695 (5th Cir.1971); *Woodward v. Wright,* 266 F.2d 108, 116 (10th Cir.1959); *see Landreth Timber Co. v. Landreth,* 471 U.S. 681, 694–95 n. 7, 105 S.Ct. 2297, 2307 n. 7, 85 L.Ed.2d 692 (1985). To apply the exemptions of section 3 and 4 to section 12(2) would also collapse any distinction between section 3 and 4. In *Landreth,* the Supreme Court rejected the sale of business doctrine. The petitioner had sought rescission of stock pursuant to section 12(1) of the 1933 Act (for failure to register the securities) and fraud damages pursuant to the 1934 Act. *Id.,* 471 U.S. at 684, 105 S.Ct. at 2300–01. Although the case did not involve prospectus fraud under section 12(2), the Court stated

> The 1934 Act contains several provisions specifically governing tender offers, disclosure of transactions by corporate officers and principal stockholders, and the recovery of short-swing profits gained by such persons. Eliminating from the definition of "security" instruments involved in transactions where control passed to the purchaser would contravene the purposes of these provisions. *Furthermore, although § 4(2) of the 1933 Act exempts transactions not involving any public offering from the Act's registration provisions, there is no comparable exemption from the antifraud provisions.*

*Id.* at 692, 105 S.Ct. at 2305 (emphasis added; citations omitted). Finally, a statute that states when a registration statement is required does not necessarily dictate when a prospectus materializes.[14] *See, e.g., Capri v. Murphy,* 856 F.2d 473, 476 (2d Cir.1988).

For example, suppose section 5 stated that unless the state issued a person a firearms license, a person could not carry a handgun; and section 12(2) made it unlawful to kill another person while using a handgun. Certainly a person (whether or not he had a firearms license) would violate section 12(2) by using a handgun to kill another person, even though section 5 contemplates a person using a handgun only after first being issued a firearms license. The analysis does not aid in defining what constitutes a handgun. In the same manner, although section 5 contemplates a registration statement prior to a prospectus, an examination of section 5 does not assist in defining the term prospectus in section 12(2). Therefore, nothing in section 12(1) *requires* a different definition of prospectus in section 12(2) than that contained in section 2(10).

Section 12(2) forbids fraud "by means of a prospectus or oral communication." Pa-

13. In the context of Regulation D limited offerings, the Commission, in exempting certain transactions from the scope of the registration requirements of section 5, has stated that "Such transactions are not exempt from the antifraud, civil liability, or other provisions of the federal securities laws." 17 C.F.R. § 230.501 *et seq.* (Preliminary notes). Thus, the Commission interprets section 5 as not limiting section 12(2).

14. Note that even where a registration statement is not required, sellers are free to voluntarily register their securities. Section 6 ("Any security may be registered").

cific argues that the addition of the words "oral communication" broadens the definition of prospectus, although they clearly are neither arguing that the stock purchase agreement is an oral communication nor that other oral communications are at issue in this case. The 1933 Act does not define "oral communication." We agree with the Third Circuit that the term "oral communication" is restricted to those oral communications relating to a prospectus. *Ballay,* 925 F.2d at 688, *citing Schreiber v. Burlington Northern Inc.,* 472 U.S. 1, 8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985) ("words grouped in a list should be given related meaning" (citation omitted)).

> This reading comports with the canon of construction *noscitur a sociis,* which instructs that a provision should not be viewed "in isolation but in the light of the words that accompany it and give [it] meaning." *Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989). As the Supreme Court noted when construing the meaning of one term in a phrase:
>
> > [t]he maxim *noscitur a sociis,* that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress. *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).

*Ballay,* 925 F.2d at 688. The words "oral communication" are words of form, not substance; they describe how one communicates a message, not the message content. Whether the term prospectus in section 2(10) is found to include a certain message, certainly Congress intended the same words, though spoken orally, to enjoy exactly the same treatment. A prospectus in section 2(10) includes a "prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television." By adding "or oral communication" in section 12(2), Congress was just adding oral communications to the section 2(10) list. The key to defining prospectus, however, is not in the listed communication media, but rather in whether the substance of the words used offers to sell or confirm the sale of a security.

In this case the parties dispute the definitional scope of prospectus in section 12(2). Allen argues to confine a prospectus to initial offerings; Pacific wants the broad definition in section 2(10) to apply. Section 2(10) is broad enough to include initial and secondary market transactions. But section 2 begins with the phrase "When used in this title, unless the context otherwise requires...." Although the 1933 Act may contain more than one definition of a prospectus, considering the foregoing analysis, we cannot say that the structure of the 1933 Act, the text of section 12, and in particular the context of the word "prospectus" in section 12(2), *require* a definition of prospectus contrary to the broad definition of section 2(10). The text of the 1933 Act refutes Allen's contention that section 12(2) applies only to initial offerings. Allen nevertheless argues that the legislative history shows Congress's intention to limit the scope of civil liability under the 1933 Act.[15]

### III. The Legislative History of the 1933 Act

In *Rowland,* the Court indicated that in a statute involving language conditioned upon

15. In the context of an initial offering memorandum, the Supreme Court has held that section 28(a) of the Securities and Exchange Act of 1934 (1934 Act) does not require a rescissionary recovery under section 12(2) of the Securities Act or section 10(b) of the Exchange Act to be offset by any tax benefits received from a tax shelter investment. *Randall v. Loftsgaarden,* 478 U.S. 647, 667, 106 S.Ct. 3143, 3155, 92 L.Ed.2d 525 (1986). In looking to the rescissionary wording of section 12(2), the Court cited the usual phrase that "the starting point in construing a statute is the statute itself" and concluded that section 12(2) "speaks with the clarity necessary to invoke this 'plain meaning' canon." *Id.,* 478 U.S. at 656, 106 S.Ct. at 3149. However, the Court has confined its interpretation of section 12 rescission to a remedy analysis; in determining "seller" status under section 12(1), the Court has stated "there is no indication that Congress employed the remedy for its delineation of potential defendants." *Pinter v. Dahl,* 486 U.S. 622, 647–48 n. 23, 108 S.Ct. 2063, 2079 n. 23, 100 L.Ed.2d 658 (1988). Thus, *Randall* does not confine our analysis to the plain meaning of section 12(2). Rather, the Court has continued to look at the legislative history in securities cases.

its "context," legislative history should not affect the decisionmaking. *Id.,* —— U.S. at ——, 113 S.Ct. at 720. Thus, in the present case we could rest on our analysis up to this point. We will nevertheless address the legislative history, because the district court followed *Ballay,* which relied extensively on legislative history. While we reject *Ballay* 's legislative history analysis, we also note that *Rowland* appears to reject any reliance upon legislative history for "context" purposes.

In *Ballay* the Third Circuit placed emphasis on the legislative history of the 1933 Act to illustrate Congress's intent that section 12(2) "regulate initial offerings." 925 F.2d at 690 (relying on the object and structure of the Act and citations to the House Report, H.R.Rep. No. 85, 73d Cong., 1st Sess. (1933)). We will begin by briefly tracing the pertinent legislative history from the House, then from the Senate and finally Congress's compromise of both versions.[16] The final House version of section 12(2) proposed by the House Interstate and Foreign Commerce Committee stated that:

> Sec. 12. Any person who—(2) sells a security (whether or not exempted by section 3), by the use of any means of instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such truth or omission, shall be liable to the person purchasing such security from him....

H.R. 5480, 73d Cong., 1st Sess. (1933), as passed by the House on May 5, 1933, 3 Ellenberger & Maher, item 26, at 25. Pursuant to this version, the House Report made the following comments about the Act:

> The character of civil liabilities imposed by this bill are described in detail elsewhere. Their essential characteristic consists of a requirement that all those responsible for statements upon the face of which *the public is solicited* to invest its money shall be held to standards like those imposed by law upon a fiduciary.
>
> * * * * * *
>
> *The bill affects only new offerings of securities* .... It does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristic of a new offering by reason of the control of the issuer possessed by those responsible for the offering.

H.R.Rep. No. 85, 73d Cong., 1st Sess. (1933), to accompany H.R. 5480, May 4, 1933, 2 Ellenberger & Maher, item 18, at 5 (emphasis added).

> In view of these [transaction and security] exemptions and the restriction of *the bill's application to new offerings,* the bill does not affect transactions beyond the need of public protection.

*Id.* at 7 (emphasis added).

> Section 10 of the bill requires that any "prospectus" used in connection with the sale of any securities, if it is more than a mere announcement of the name and price of the issue offered and an offer of full details upon request, *must include a substantial portion of the information required in the "registration statement."* The Commission is given power to classify prospectuses according to the nature and circumstances of their use and to prescribe the form and contents appropriate to each class. While a leeway is given to the Commission to meet the varying exigencies of business transactions, fundamental safeguards necessary to insure a fair disclosure are to be preserved.
>
> "Prospectus" is defined in section [2(10) ] to include "any prospectus, notice, circular, advertisement, letter, or other

16. [G]eneralized references to the remedial purposes of the securities laws will not justify reading a provision more broadly than its language and the statutory scheme reasonably permit. Thus, if the language of a provision of the securities laws is sufficiently clear in its context and not at odds with the legislative history, it is unnecessary to examine the additional considerations of policy that may have influenced the lawmakers in their formulation of the statute.

*Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980) (citations and quotations omitted).

communication offering any security for sale."

The purpose of these sections is to secure for potential buyers the means of understanding the intricacies of the transaction into which they are invited. The full revelations required in the filed "registration statement" should not be lost in the actual selling process. This requirement will undoubtedly limit the selling arguments hitherto employed. That is its purpose.... Any objection that the compulsory incorporation *in selling literature* and sales argument of substantially all information *concerning the issue,* will frighten the buyer with the intricacy of the transaction, states one of the best arguments for the provision.

*Id.* at 8 (emphasis added).

Sections 11 and 12 create and define the civil liabilities imposed by the act and the machinery for their enforcement which renders them practically valuable. Fundamentally, *these sections entitle the buyer of securities sold upon a registration statement* including an untrue statement or omissions of material fact, to sue for recovery of his purchase price, or for damages not exceeding such price, those who have participated in such distribution either knowing of such untrue statement or omission or having failed to take due care in discovering it....

The committee emphasizes that these [civil] liabilities attach only when there has been an untrue statement of material fact or an omission to state a material fact in the registration statement or *the prospectus—the basic information by which the public is solicited.*

*Id.* at 9 (emphasis added). This discussion of sections 10–12 and the definition of prospectus show that, in the main, prospectuses arise after registration statements are filed; thus the reason that the prospectus "must include a substantial portion of the information required in the 'registration statement.'" The broad definition of a prospectus in section 2(10) prevented sellers from thwarting the registration statement provisions by artfully drafting subsequent "selling literature." In discussing the exemptions to the requirement of filing a registration statement, the House Report continued:

The provisions of this section [4] exempt certain transactions from the provisions of section 5, which section requires both the registration of securities as a condition precedent to offering them for sale ..., *and which section also requires that after the effective date of registration prospectuses relating to such securities shall conform to the requirements of the act.*

Paragraph (1) broadly draws the line between distribution of securities and trading in securities, indicating that *the act is, in the main, concerned with the problem of distribution as distinguished from trading.* It, therefore, exempts all transactions except by an issuer, underwriter, or dealer.

*Id.* at 15. Based on the House Report, the legislative history of the 1933 Act can be read to focus on those offerings requiring a registration statement, or as the Third Circuit interprets, to initial offerings.

The Senate, however, proceeded along a different course. The final Senate version of section 12(2) (contained in section 9 of the Senate's version) proposed by the Senate Banking and Currency Committee, *see* S. 875, May 8, 1933, 77 Cong.Rec. 2996–3000 (1933), 1 Ellenberger & Maher, item 8, at 2998, stated that:

[Sec. 12]. Every person acquiring *any security* by reason of any false or deceptive representation made in the course of or in connection with a sale or offer for sale or distribution of such securities shall have the right to recover any and all damages suffered by reason of such acquisition of such securities from the person or persons signing, issuing, using, or causing, directly or indirectly, such false or deceptive representation, jointly or severally.

H.R. 5480, 73d Cong., 1st Sess. (1933), as passed the Senate with Senate amendments May 10, 1933, 3 Ellenberger & Maher, item 27, at 60 (emphasis added). The Senate's version of the 1933 Act allowed recovery for fraud in the sale of "any security," not just those involved in initial offerings. The Senate rarely mentioned the word "prospectus," and certainly not in the fraud context of

section 12(2).[17] And the Senate, as compared with the House, did not draft as detailed a report in support of the bill. Although the Senate did not as extensively explain its version, the differing texts display a distinctive treatment on their face.

A conference by the House and Senate resulted in the 1933 Act as now codified in 15 U.S.C. §§ 77a *et seq.* After the conference by the House and Senate, the managers on the part of the House attached a commentary to the final version, addressing the distinctions and the resolution between the previous versions:

> The Senate amendment imposed liability upon persons making false and deceptive statements in connection with the distribution or sale of a security. The House bill made the liability depend upon the making of untrue statements or omissions to state material facts. This phrase has been clarified in the substitute to make the omission relate to the statements made in order that these statements shall not be misleading, rather than making a mere omission—unless the act expressly requires such a fact to be stated—a ground for liability where no circumstances exist to make the omission itself misleading.
>
> The House bill (sec. 12) imposes civil liability for using the mails or the facilities of interstate commerce to sell securities (including securities exempt, under section 3, from other provisions of the bill) by means of representations which are untrue or misleading by reason of omissions of material facts. The substantially similar provisions of the Senate amendment did not apply to any of the securities exempted under the Senate amendment. The substitute exempts from the operation of this section sales of securities covered by section 3(a)(2), which relates, broadly speaking, to securities issued or guaranteed by the United States or any State, Territory, or the District of Columbia, or by a public instrumentality, or by a Federal Reserve bank or national bank, or by a supervised State bank.

Conference Report submitted in House and agreed to, May 22, 1933, 77 Cong.Rec. 3891–3902 (1933), 1 Ellenberger & Maher, item 13, at 3902 (emphasis added); H.R.Rep. No. 152, 73d Cong., 1st Sess. (1933) (Conference Report) to accompany H.R. 54809, May 20, 1933, 2 Ellenberger & Maher, item 19, at 26 (emphasis added).[18] Allen in this case points to section 12(c) of the Senate's final version (not included in the final 1933 Act) to show that the Senate intended the civil fraud provisions to apply only to initial offerings.

> Section 12. Except as hereinafter otherwise expressly provided, the provisions of this Act shall not apply to any of the following transactions: ... (c) Isolated transactions in which any security issued subsequent to the date of approval of this Act is sold, or offered for sale, subscription, or delivery by the owner thereof, or by his representative solely for the owner's account, such sale or offer for sale, subscription, or delivery not being made in the course of repeated and successive transactions of a like character by such owner for the purpose of engaging in the purchase and sale of securities as a business, such owner or representative not being the issuer or underwriter of, or selling agent for, such security.

H.R. 5480, 73d Cong., 1st Sess. (1933), as passed the Senate with Senate amendments on May 10, 1933, 3 Ellenberger & Maher, item 27, at 66. Taking for granted (without deciding) that the language of section 12(c) limits the provisions of the Act to initial offerings, the conference report stated that the "substantially similar [civil liability] provisions of the Senate amendment did not apply to any of the securities exempted under the Senate amendment." The conference report thus interpreted section 9 of the Senate's version, which began with the phrase "Every person acquiring any security," as language that "expressly provided" that the limitations of section 12(c) would not

17. The Supreme Court has noted that the legislative history of section 12(2) is "sparse". *Randall,* 478 U.S. at 657, 106 S.Ct. at 3149–50.

18. The Senate passed the conference report (the final version of the 1933 Act) without a similar commentary on the part of the Senate managers. May 22–23, 1933, 77 Cong.Rec. 3879–3888; 4009 (1933), 1 Ellenberger & Maher, item 14, at 3888.

have applied. Therefore, we reject Allen's assertion that the Senate's final version displayed any limitation of the civil liability provisions to initial offerings.

The commentary by the House's managers did not mention their version that had limited the application of section 12(2) to fraud in a prospectus or oral communication; rather, the report recognized the Senate version, which applied section 12(2) to the distribution *or sale* of a security. The Senate version, as the House, had defined "sale" very broadly.[19] And there is no legislative history in the Senate that requires the "sale" of a security be limited to initial offerings. In the face of the Senate's broad wording, that civil fraud applies to any sale, the commentary by the House's managers after the joint conference remained silent. Although the legislative history in the House report can be read to focus solely on those offerings pursuant to a registration statement and prospectuses (or in the Third Circuit's words, to initial offerings), the Senate's version of the 1933 Act and the conference report do not confirm the House's comments. Thus, our reading of section 12(2) is not at odds with the legislative history. The legislative history of the 1933 Act does not require the context of the word "prospectus" to have a more narrow definition than that specified in section 2(10).

### IV. The Impact of Section 12(2) on the 1933 Act Section 17 and the 1934 Act Section 10(b)

The defendants argue that section 12(2) should be viewed in light of corresponding provisions in the 1933 Act and the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 891, 15 U.S.C. §§ 78a *et seq.*[20] Specifically, "the interdependence of the various sections of the securities laws is certainly a relevant factor in any interpretation of the language Congress has chosen." *SEC v. National Sec., Inc.*, 393 U.S. 453, 466, 89 S.Ct. 564, 571, 21 L.Ed.2d 668 (1969), *quoted in Hochfelder*, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668.[21] *See Pinter*, 486 U.S. at 651, 108 S.Ct. at 2080–81 (criticizing an analysis that is divorced from "any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme."). *Accord Rowland*, — U.S. at —, 113 S.Ct. at 720. Allen points to the differences between sections 12(2) and 17 of the 1933 Act: Section 12(2) allows a purchaser to obtain rescission in a case involving a "prospectus or oral communication" that contains a false, material fact. Section 17(a) of the 1933 Act, however, makes it unlawful for "any person in the offer or sale of any securities ... directly or indirectly"

> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

19. The Senate version had defined "sale" or "sell" to

> include every disposition, or attempt to dispose, of a security or interest in a security for value. For the purposes of the enforcement of this Act only, any security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing, shall be conclusively presumed to constitute a part of the subject of such purchase. "Sale" or "sell" shall also include a contract to sell, an exchange, an attempt to sell or exchange, an option of sale, purchase, or exchange, a solicitation of a sale or an exchange, a subscription or an offer to sell or exchange, directly or by an agent, or by a circular, letter, advertisement, or otherwise.

H.R. 5480, 73d Cong., 1st Sess. (1933), section 2(c), as passed the Senate with Senate amendments on May 10, 1933, 3 Ellenberger & Maher, item 27, at 40.

20. As with the 1933 Act, the citations in the opinion will refer to the more familiar sections of the 1934 Act, rather than to the particular sections of the United States Code.

21. With regards to the 1934 Act section 10(b) claims, the Supreme Court recently adopted the one and three year statutes of limitations of section 9(e), rather than apply state borrowing principles. *Lampf, Pleva, Lipkind v. Gilbertson*, — U.S. —, —, and n. 9, 111 S.Ct. 2773, 2782 and n. 9, 115 L.Ed.2d 321 (1991). The Court noted the effect such an interpretation would have on the "complex web of regulations"; in particular, sections 9, 18 and 20A of the 1934 Act, and section 13 of the 1933 Act. *Id.*, — U.S. at — - —, 111 S.Ct. at 2780–82.

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

In *United States v. Naftalin,* 441 U.S. 768, 778–79, 99 S.Ct. 2077, 2084, 60 L.Ed.2d 624 (1979), section 17(a) was the basis of Naftalin's criminal conviction for selling his broker short. He argued successfully to the Eighth Circuit that section 17(a) forbids such fraud only against investors, not brokers. 579 F.2d 444, 447 (1978). The Supreme Court reversed, holding that section 17(a) applied to the entire selling process. 441 U.S. at 772–73, 99 S.Ct. at 2083–84.

Allen notes correctly that section 17 applies to securities sold "directly or indirectly," while section 12(2) applies to a "prospectus or oral communication." Allen argues, by negative implication, that because Congress had intended the scope of section 17 to include initial and secondary sales, by not using the identical words "directly or indirectly" in both sections, Congress intended to confine section 12(2) to initial offerings. *Compare Ballay,* 925 F.2d at 691 *with Barnes v. Osofsky,* 373 F.2d 269, 272 (2d Cir.1967) ("In contrast both §§ 12(2) and 17, the antifraud sections of the 1933 Act ... are not limited to the newly registered securities."). The short rejection of Allen's argument is that Congress, within certain constitutional bounds, can write the statute as Congress desires. In addition, nothing in the Supreme Court's reasoning in *Naftalin* directs that a broad reading of section 17 dictates a narrow reading of the remainder of the 1933 Act.

*Naftalin* is first and foremost a teaching in statutory construction. The Supreme Court interpreted the words "offer" and "sale" and concluded that the Congress intended a broad interpretation. 441 U.S. at 773, 99 S.Ct. at 2081–82. "Prospectus" is likewise explicitly defined in section 2 of the 1933 Act, yet Allen now wishes a narrow interpretation of the word. The Supreme Court also interpreted the language of section 17, "Any person in the offer or sale of any securities ... *directly or indirectly* ... to employ any device, scheme, or artifice to defraud ...," as not *requiring* that "the victim of the fraud be an investor." *Id.* Likewise, as this opinion discusses above in part II.A, nothing in sections 2(10) or 12(2) *requires* a distinction between initial offerings and secondary trading.

Next, Naftalin argued that the primary purpose of the 1933 Act was to protect investors, not brokers (resting upon language in the *Hochfelder* opinion, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668). *Naftalin,* 441 U.S. at 775, 99 S.Ct. at 2082–83. The Supreme Court rejected the argument, concluding that investor protection was not the sole purpose of the 1933 Act; Congress also wanted to encourage a high ethical standard in "every facet of the securities industry." *Id.,* 441 U.S. at 775, 99 S.Ct. at 2082–83, *citing SEC v. Capital Gains Bureau,* 375 U.S. 180, 186–187, 84 S.Ct. 275, 280, 11 L.Ed.2d 237. The Supreme Court found ample support for this conclusion in the legislative history of section 17(a). In this case, the parties do not dispute that section 12(2) protects purchasers.

Lastly, Naftalin argued that the 1933 Act concerned only initial public offerings and that because his fraud occurred in the aftermarket, only the 1934 Act applied. *Naftalin,* 441 U.S. at 778, 99 S.Ct. at 2084. The Supreme Court had described the 1933 Act as "designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Hochfelder,* 425 U.S. at 195, 96 S.Ct. at 1382. In *Naftalin* the Supreme Court added that "the 1933 Act was primarily concerned with the regulation of new offerings." *Naftalin,* 441 U.S. at 777–78, 99 S.Ct. at 2083–84. In the context of section 17(a) of the 1933 Act, however, the Supreme Court carved out an exception to these general statements, concluding that section 17(a) "was meant as a major departure from that limitation. Unlike much of the rest of the [Securities] [A]ct, it was intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading." *Id.,* 441 U.S. at 778, 99 S.Ct. at 2084.

Allen argues that section 12(2) is not another "major departure" from the general observation that the 1933 Act applies only to initial offerings and the 1934 Act applies to secondary market transactions. We do not share in Allen's enthusiasm. Yes, the Supreme Court assumed that much of the 1933 Act regulates new offerings. In this case Pacific does not challenge that precept. But the Supreme Court viewed section 17 as a major departure from the 1933 Act in the sense that the criminal fraud provision "covered *any* fraudulent scheme." *Naftalin,* 441 U.S. at 778, 99 S.Ct. at 2084.[22] Section 12(2) is not that major a departure—the civil fraud provision does not apply to *any* fraudulent scheme, only to a particular circumstance of fraud in a prospectus. Such particular articulation by Congress sets section 12(2) apart from any analysis based on general observations. *Hochfelder,* 425 U.S. at 200 and 207–08, 96 S.Ct. at 1384 and 1387–88.

In addition to sections 12(2) and 17 of the 1933 Act, another corollary civil fraud provision appears in the 1934 Act. In fact, the scope of section 10(b) of the 1934 Act seems to have caused the relatively recent emphasis in section 12(2). In *Hochfelder,* the Supreme Court was presented with the scope of section 10(b) and the Securities and Exchange Commission rule 10b–5, 17 C.F.R. § 240.10b–5 (1975 (first promulgated in 1942)). They make it unlawful for any person to use any manipulative or deceptive device in the purchase or sale of any security, and provide plaintiffs with a civil damage provision under which to seek redress for material misstatements or omissions of fact.[23] The circuit courts of appeals were split on the necessary showing regarding the misstatement; the standard had ranged from simple negligence to intentional fraud. The Supreme Court chose a standard close to the latter, holding that a private right of action under section 10(b) and rule 10b–5 must show "scienter"; that is, an intent to deceive, manipulate or defraud. *Hochfelder,* 425 U.S. at 188, 96 S.Ct. at 1378. Because of the scienter requirement defrauded persons would have to look to other federal or state security act provisions to challenge a negligent misstatement or omission of fact.

One of the many reasons the Supreme Court restricted the scope of section 10(b) and rule 10b–5 was the express civil fraud remedies available in the 1933 Act and their corresponding procedural limitations. *Id.* For example, an action under sections 11 and 12 of the 1933 Act explicitly recite different negligence standards, are limited by a three year statute of limitations period and require the plaintiff to post a bond for costs and attorney fees. Section 10(b) of the 1934 Act or rule 10b–5 promulgated thereunder have no comparable restrictions. The Supreme Court reasoned that to have expanded section 10(b) and rule 10b–5 would have effectively negated many other, more explicit, sections of the 1933 Act. Of course, by closing the door under section 10(b) and rule 10b–5 to persons who have been negligently defrauded, but who cannot prove scienter, the Supreme Court invited all such persons to look to other sections of the securities law. Against this backdrop purchasers alleging fraud, including Pacific in this case, are seeking relief under section 12(2) of the 1933 Act. Nothing in the Supreme Court's decision in *Naftalin* or *Hochfelder,* or section 17 of the 1933 Act or section 10(b) of the 1934 Act *requires* a different interpretation of section 12(2).

Lastly, Allen argues that section 12(2) should be confined to initial offerings for various policy reasons, the majority of which merely rephrase their substantive arguments already discussed. In light of the textual clarity of section 12(2) and the corresponding legislative history, we need not comment further. *Pinter,* 486 U.S. at 653, 108 S.Ct. at

22. "This is made abundantly clear both by the statutory language, which makes no distinctions between the two kinds of transactions, and by the [legislative history]." *Naftalin,* 441 U.S. at 778, 99 S.Ct. at 2084. As this opinion discusses in part II.B, Congress intended the 1933 Act's civil fraud provisions to apply to initial offerings and to secondary trading.

23. Section 10(b) and rule 10b–5 do not expressly provide a civil remedy for a violation. An implied private action was first permitted in *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa. 1946). By 1976 the Supreme Court had simply assumed the existence of such a right developed by a substantial body of case law. *Hochfelder,* 425 U.S. at 196–97, 96 S.Ct. at 1382–83.

2081–82; *cf. Landreth,* 471 U.S. at 694–95 n. 7, 105 S.Ct. at 2307 n. 7.

### V. Conclusion

Contrary to the Third Circuit, we hold that section 12(2) applies to initial offerings and secondary market transactions. This comports with the Supreme Court's understanding in *Wilko* and what the First and Tenth Circuits have already permitted. *See supra,* part I. Nothing in the structure of the 1933 Act, the context of section 12 or in the legislative history otherwise requires a definition of prospectus different from that stated in section 2(10). Neither section 17 of the 1933 Act nor section 10(b) of the 1934 Act require the contrary. For these reasons, section 12(2) applies to any communication which offers any security for sale or confirms the sale of any security, including the stock purchase agreement in the present case. The order of the district court is REVERSED, and the case is REMANDED for proceedings consistent with the foregoing opinion.