### In re the AES CORPORATION SECURITIES LITIGATION.

**Master No. 92 Civ. 4640 (WCC).**

United States District Court, S.D. New York.

June 25, 1993.

---

Schoengold & Sporn, P.C., New York City (Samuel P. Sporn, Jessica B. Sporn, Joel P. Laitman, of counsel), Abbey & Ellis, New York City (Arthur N. Abbey, Jill S. Abrams, of counsel), for plaintiffs.

Chadbourne & Parke, New York City (Donald I. Strauber, Donald W. Rose, Eric D. Welsh, Brian A. Miller, of counsel), for defendants The AES Corp., Roger W. Sant, Dennis W. Bakke, Robert F. Hemphill, Jr., Frank Jungers, Henry R. Linden, C. Arthur Rolander, Russell E. Train, Thomas I. Un-

terberg, Robert H. Waterman, Jr. and Barry J. Sharp.

Davis Polk & Wardwell, New York City (Frank S. Moseley, of counsel), for defendants Donaldson, Lufkin & Jenrette Securities Corp., J.P. Morgan Securities, Inc. and Unterberg Harris, L.P.

WILLIAM C. CONNER, District Judge.

This class action suit is brought by plaintiffs on behalf of all individuals who purchased securities of the AES Corporation ("AES") between June 25, 1991, and June 23, 1992, pursuant to two public offerings. The First Amended Class Action Complaint ("Complaint") alleges violations of Sections 11 and 12(2) of the Securities Act of 1933; Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder; and common law fraud against AES, a number of its officers and directors (the "AES defendants"), and the investment banking firms which underwrote the public offerings (the "underwriter defendants").[1] The action is currently before the Court on defendants' motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P.

BACKGROUND

AES is a corporation which constructs and operates cogeneration power facilities.[2] Compl. ¶ 13. The dispute in this case centers around two securities offerings. AES made public offerings of $4,770,000 of common stock ("the equity offering"), and $50,-000,000 of 6.5% convertible debentures due in 2002 ("the debt offering"), pursuant to registration statements and prospectuses filed with the Securities and Exchange Commission ("SEC") on June 25, 1991, and March 12, 1992, respectively. Compl. ¶ 1. Plaintiffs allege that the prospectuses contain false and misleading statements that give rise to claims for federal securities violations and common law fraud.

The complaint cites passages from each prospectus, along with statements in AES's annual report and public statements from

---

1. Only the sections 11 and 12(2) claims are asserted against the underwriter defendants.

2. Co-generation is the production of energy by a private company both for its own use and for sale to public utilities.

AES officers, in which the company asserts its commitment to the "shared values" of "integrity," "fairness," and "social responsibility" with regard to economic and business matters. Compl. ¶ 40. The prospectuses represent that AES at times pursued these ethical values at the expense of profits. Compl. ¶ 42. In addition, plaintiffs quote passages from each prospectus in which AES represented that it was a leader in the area of environmental compliance; that its emissions levels were often below the levels required by its permits; that the company had the technology and expertise to comply with environmental laws and regulations; and that the company emphasized the use of technology to foster clean production of power. Compl. ¶¶ 46–48. Finally, the complaint points to three letters written to AES shareholders by defendants Rodger W. Sant (co-founder, chairman of the board, and chief executive officer of AES) and Dennis W. Bakke (co-founder, president, director, and chief operating officer of AES) for the quarters ending June 30, 1992, and September 30, 1991, and for the year of 1991, which discussed the financial performance of the company for those periods. Compl. ¶¶ 49–51.[3] The complaint claims that these statements, along with specific statement regarding AES's Cedar Bay, Florida Facility, Shady Point, Oklahoma Facility, and Bucksport, Maine Facility were materially false and misleading because of undisclosed occurrences at each project which, if disclosed, would have negatively affected stock prices. The allegations as to each facility are as follows.

*The Cedar Bay Facility*

The Cedar Bay Facility in Jacksonville, Florida, was an AES project designed to sell electricity to a Florida utility and steam to the neighboring paper mill run by Seminole Kraft Corporation ("SKC"). Compl. ¶ 68. In order to construct and operate this facility, AES and SKC made a joint application to the Florida Department of Environmental Regulation ("FDER") to obtain a "Site Certification" which was granted on February 17, 1991, by the Governor and his cabinet sitting as the Florida Public Power Siting Board ("FPPSB"). Compl. ¶ 3(b). On June 30, 1991, Sant and Bakke, in a letter to the AES shareholders, stated that financing had been obtained for the facility and construction had begun and was proceeding well, and in subsequent letters AES represented that the project was either on or ahead of schedule. Compl. ¶¶ 53–54. Plaintiffs claim that these statements and those in both prospectuses were false or misleading because AES failed to disclose that the Site Certification was fraudulently obtained.

In both the public relations campaign surrounding the Site Certification process and the Site Certification application itself, AES depicted the Cedar Bay Facility as a project which would improve the air quality in the Jacksonville area by shutting down SKC's existing boilers and replacing them with those employing more environmentally sound technology. Compl. ¶¶ 68–70. AES submitted its Site Certification application in November of 1988 which is quoted in the complaint as follows:

> Eight existing boilers at the mill will be shut down; three oil-fired and two bark-fired power boilers and three Kraft recovery boilers. The new CFB boilers will replace the power boilers process steam generation and the old Kraft recovery boilers will be replaced with a modern low-odor unit.
>
> . . . . .
>
> By shutting down old equipment at the paper mill, utilization of modern technology and installation of stacks consistent with good engineering practices, the project will result in numerous benefits to the environment.

Compl. ¶ 69(a). However, on September 6, 1990, AES and SKC entered into a steam purchase agreement in which they agreed, subject to state approval, to maintain SKC's old boilers if the repowering would not conflict with the Site Certification. Compl. ¶¶ 3(b), 71; Strauber Aff., Ex. E ¶ I.(N). The Site Certification ultimately issued by the FPPSB on February 17, 1991, included a

---

**3.** The letter discussing AES's performance in 1991 was incorporated into AES's 1991 annual report. Compl. ¶ 51.

provision requiring that the boilers be shut down. The complaint quotes the Site Certification as follows:

This certification and any individual air permits issued subsequent to the final order of the Board certifying the power plant site under 403.509, F.S., shall require, that the following Seminole Kraft Corporation sources be permanently shut down and made incapable of operation, and shall turn in their operation permits to the Division of Air Resources Management's Bureau of Air Regulation, upon completion of the initial compliance tests on the AESCB boilers: the No. 1 PB (power boiler), the No. 2 PB, the No. 3 PB, the No. 1 BB (bark boiler) and the No. 2 BB. BESD shall be specifically informed in writing within thirty days after each individual shut down of the above referenced equipment. This requirement shall operate as a joint and individual requirement to assure common control for purpose of ensuring that all commitments relied on are in fact fulfilled.

Compl. ¶ 72.

In late 1991, a question arose as to whether AES actually intended to shut down the SKC boilers, and local Jacksonville officials petitioned the state to re-open the Cedar Bay Facility's Site Certification process, claiming that AES misled the FPPSB. Compl. ¶¶ 79–80. Florida State Attorney General, Robert A. Butterworth, responded to the local pressure in early January 1992, by directing FDER Secretary Browner to determine whether AES or SKC had taken actions in violation of the Site Certification. Compl. ¶¶ 82–83. On January 16, 1992, Secretary Browner determined that the operation of the boilers would be a violation of the Site Certification, but that there was no evidence to support revoking the Certification. Compl. ¶ 84.

However, on March 3, 1992, Secretary Browner reported to Florida Governor Lawton Chiles that AES "may" have made material misstatements during the Site Certification process. Compl. ¶ 85. On March 6,

1992, the Governor directed Attorney General Butterworth to appoint Special Counsel, Denis Dean, to investigate. Compl. ¶ 86. AES is alleged to have intentionally withheld its agreement to sell steam to SKC from Dean's investigation because the letter was not produced pursuant to Dean's March 30, 1992 general request for documents and was only produced upon specific request on May 1, 1992. Compl. ¶¶ 88–89. On May 4, 1992, Butterworth wrote to the Governor, explaining that the undisclosed letter of intent indicated that the FDER and FPPSB had been grossly misled by AES's Site Certification application, and he recommended that they commence proceedings to suspend the Certification. Compl. ¶ 90.[4] As a result, on May 5, 1992, financing of the Cedar Bay Facility was withdrawn, and AES was forced to sell the project. Compl. ¶ 92.

*The Shady Point Facility*

The AES facility in Shady Point, Oklahoma sold electricity to Oklahoma Gas and Electric Company beginning in January of 1991, and it was therefore subject to state and federal environmental regulations. These regulations required the plant to monitor and control its wastewater discharge into Oklahoma waterways, and they also imposed record-keeping requirements upon the company. Compl. ¶¶ 94–97. In June of 1992, AES disclosed to the federal and state agencies and to the general public that, from the time the Shady Point Facility had begun operations, employees had been intentionally falsifying wastewater discharge reports so that it would appear that the plant was in compliance with the relevant regulations when, in fact, it was not. Compl. ¶ 98. As a result plaintiffs allege that AES common stock fell from $28.75 to $16.50 per share and the debentures fell from $960 to $720 each. Compl. ¶ 99.

*The Bucksport Facility*

AES had plans to construct a 180–megawatt co-generation facility in Bucksport,

---

4. Defendants have supplied the Court with Butterworth's May 4, 1992, letter which was actually written to State Comptroller Lewis, in which the Attorney General states that the FDER knew that AES and SKC were considering the option of continuing the use of the SKC boilers but the state was not privy to the actual steam purchase agreement. Strauber Aff., Ex. E. However, we will not consider this letter pursuant to this motion to dismiss.

Maine. In order to obtain EPA approval for the project, in May of 1990 AES submitted to the EPA an Environmental Information Document in which the company revealed its plans to build a facility that would sell steam to Champion International Paper Mill ("CIPM") and electricity to Central Maine Power Company ("CMP") and other utilities. Compl. ¶ 58. The complaint cites a letter to the editor, which is attributed to an AES representative and was printed on May 17, 1990, in *The Bucksport Free Press*. The letter asserts that AES's Bucksport Facility was a solution to Maine's growing energy needs. Compl. ¶ 59. In May of 1990 AES filed a "Shoreland Zoning Application" with the Bucksport Planning Board and on June 14, 1990, an AES representative testified before the board that the facility would be built to meet Maine's power needs. Compl. ¶ 60. In August of 1990, AES began preparing the Environmental Impact Statement ("EIS") which would be used to assist the EPA in its analysis of the facility. Compl. ¶ 61. Although AES had regular contact with the EPA, it was not until June 20, 1991, that the agency became aware of the fact that utilities located in Maine had no present or future need to purchase electricity from the proposed facility. Compl. ¶ 62.

The equity and the debt prospectuses disclosed the generalized risks faced by cogeneration projects while in the planning phase, and disclosed many of the specific risks faces by the Bucksport Facility. In addition, the prospectus revealed that the only power supply contracts that AES had made with regard to the Bucksport Facility were with utilities outside the State of Maine. Compl. ¶¶ 63, 65. Nonetheless, plaintiffs claim the prospectuses failed to disclose all the impediments to the project's development.

## DISCUSSION

■ On a motion to dismiss we accept all allegations in the complaint as true, and dismiss only if, after drawing all inferences in plaintiffs' favor, it is clear that they are not entitled to relief. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). There are two arguments made in support of defendants' contention that the complaint fails to state a claim on which relief can be granted. First, defendants point out that at the core of each of plaintiffs' securities claims must be a misrepresentation or omission of material fact, *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 755 (2d Cir.1986) (discussing sections 11, 12(2), and Rule 10b–5); *see, I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991) (discussing section 11 and Rule 10b–5), and they argue that the complaint fails to state any such misrepresentations or omissions to support the claims. Additionally, defendants argue that the claims rooted in the Securities Act of 1933 are deficient because the complaint does not allege a sufficient connection between plaintiffs'. securities purchases and the public offerings at issue.[5] We address each of defendants' arguments in turn.

■ As a threshold matter, we must determine which documents are properly before the Court pursuant to this motion to dismiss. As a general rule, a motion to dismiss addresses only the validity of plaintiffs' allegations as they appear on the face of the complaint. *Anderson v. Coughlin*, 700 F.2d 37, 40 (2d Cir.1983). However, the complaint is deemed to include any document attached as an exhibit or any document that the complaint incorporates by reference. *Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985). Since the complaint contains extensive quotations from both the debt and the equity prospectuses, these documents are incorporated by reference into plaintiffs' pleading.[6] Similarly, the Steam Purchase

---

5. Plaintiffs do not oppose defendants' additional argument that the section 11 claims should be dismissed against Robert F. Hemphill because he is not alleged to be either an AES director or a signatory to the registration statement. Thus, the section 11 claim is dismissed against this defendant. *See Somerville v. Major Exploration, Inc.*, 102 F.R.D. 500, 507 (S.D.N.Y.1984) (section 11 claim dismissed against high ranking officer because officer was neither a director nor a signatory of the registration statement).

6. We may also take judicial notice of the prospectuses because they have been publicly filed with the SEC. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991).

Agreement between AES and SKC is discussed in numerous paragraphs of the complaint and the complaint partially paraphrases its content and thus we believe it too is incorporated by reference into the complaint. Compl. ¶¶ 2, 3(b), 88, 89, 90, 93. However, even if this contract is not incorporated by reference, we may consider it because it is the sole document on which plaintiffs' fraud allegations as to the Cedar Bay Facility are based. Plaintiffs may not defeat this properly argued motion simply because they chose not to attach to the complaint or incorporate therein by reference the document on which their fraud claim is solely based. . *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992) (document on which plaintiffs rely may be considered upon a motion to dismiss); *I. Meyer Pincus*, 936 F.2d at 762 (prospectus solely relied upon by plaintiff examined in determining a motion to dismiss, in spite of the fact that it was not attached to complaint or incorporated therein by reference). *See Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 170 n. 3 (S.D.N.Y.1988).

## I. The Alleged False and Misleading Statements

Defendants argue that the complaint fails to state any false or misleading statements of material fact to support the securities violations. Plaintiffs point to misstatements by AES which assert its commitment to "shared values" of "integrity," "fairness" and "social responsibility", extol AES's environmental record and expertise, and claim that AES's financial condition was "very positive", having grown in late 1991 and 1992.

Defendants argue that these were general statements of opinion and belief which cannot support claims alleging securities violations absent an allegation that defendants did not honestly hold the beliefs at the time the statements were made. *See Virginia Bankshares, Inc. v. Sandberg*, —— U.S. ——, ———–——, 111 S.Ct. 2749, 2756–59, 115 L.Ed.2d 929 (1991). Plaintiffs respond by arguing that the complaint sets out specific undisclosed negative facts regarding AES's Cedar Bay, Shady Point and Bucksport facilities and, if proven, these facts would be sufficient to show defendants did not hold the opinions and beliefs stated in the prospectuses. Defendants also contend that the statements as to AES's ethical values and its environmental commitment in the prospectuses simply convey the company's broad corporate objectives and should be read in the context of the cautionary language and specific disclosed risk contained in the prospectuses. *See Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986). Plaintiffs counter by pointing again to the alleged omissions as to the three AES facilities and arguing that the disclosure of general risk factors does not absolve defendant from revealing specific manifestations of those risks within their knowledge at the time the statements in the prospectuses were made. *In re First Am. Center Sec. Litig.*, 807 F.Supp. 326, 333 (S.D.N.Y.1992); *Sperber Adams Assoc. v. JEM Management Assoc. Corp.*, 1992 WL 138344, *7–*8 (S.D.N.Y.1992); *Jameson v. Prudential–Bache Sec.*, 1990 WL 52197, *4 (S.D.N.Y.1990).

These arguments reveal that the real issue in dispute is whether the complaint sets out material misrepresentations or omissions pertaining to the three facilities at issue. If such statements are alleged, they render the general statements discussed above false or misleading, and serve as a basis for the securities claims. We address the claims as to each facility in turn to determine whether material misrepresentations or omissions are alleged.

## A. The Cedar Bay Facility

The gravamen of plaintiffs' claim as to the Cedar Bay Facility is that AES fraudulently obtained the Site Certification for this project from the State of Florida, and by failing to disclose this fraud in either the debt or the equity prospectus, AES perpetrated a fraud upon its investors. We find these allegations to be meritless. The letter of agreement, which plaintiffs and the State of Florida put forth to support their allegation that AES never intended to comply with the provisions of the Site Certification, actually reveals a painstaking attempt by AES

and SKC to comply with the Site Certification.

On September 6, 1990, SKC and AES entered into an agreement in which the former agreed to purchase steam from the latter. The agreement reveals SKC's intent to seek recertification of its existing boilers. AES argues that although the Site Certification requires that the operation permits 'for the old SKC boilers be turned in to the FDER, and that the boilers be "permanently shut down", this does not preclude refitting the old boilers with new pollution control devices and petitioning the State of Florida to issue a new permit for the operation of the boilers.[7] Although AES advocates this interpretation of the Cedar Bay Site Certification, AES and SKC drafted their agreement so that it would conform to any interpretation the State of Florida might give to the Site Certification. The agreement requires SKC to operate its boilers in a manner consistent with the Site Certification or to shut them down;[8] if the State of Florida precluded SKC from restarting its boilers, the contract gave SKC the option to terminate the steam purchase agreement.[9]

It is clear from the State of Florida's behavior that it construed the conditions of the Site Certification as prohibiting the renovation and recertification of SKC's boilers. Given this construction, the agreement would prohibit SKC from operating the boilers. Further, the agreement reveals SKC's intention to seek a letter from the FDER stating that the operation of its existing boilers would not violate the Site Certification. The State of Florida could have prevented the use of these boilers by simply refusing to issue such a letter and thus making public its rejection of AES's interpretation of the Site Certification. Finally, the State of Florida could have prevented the use of these boilers by simply refusing to recertify them.[10] Consequently, AES could not have predicted, and need not have disclosed, that the State of Florida would institute a fraud investigation based on the existence of this letter of agreement which, although it contemplated refiring SKC's existing boilers, was drafted to allow for the eventuality that the State of Florida would prohibit such action.

Nonetheless, Florida state officials, at the behest of local Jacksonville politicians, did seize upon this steam purchase agreement and used it to challenge AES's Site Certification for the Cedar Bay project. This challenge alone was sufficient to destroy the financing for the facility and force AES to abandon the project. We find that the risk of such local political opposition was fully and conspicuously disclosed by AES. The equity and the debt prospectuses both contain the following paragraphs:

*Development Uncertainties.* AES develops large and complex projects, the completion of any of which is subject to substantial risks. There can be no assurance that AES will be able to ... overcome local opposition, obtain the necessary site agreements, .... environmental and other permits and financing commitments necessary for the successful development of such projects. These risks may result

---

7. Defendants have provided the Court with two EPA memoranda suggesting that power sources *that have been "permanently shut down" may be recertified and operated.* AES Br. in Sup. at tab 2.

8. Paragraph I.(N) of the letter agreement states "[SKC] shall operate or shut down its boilers consistent with the AES–CB Conditions for Site Certification." Strauber Aff., Ex. E.

9. The termination provision of the contract reads as follows:
 A. ... There will be no early termination provisions, except:
 — if [SKC] is unable to obtain from the Florida DER (and the Jacksonville BESD, if necessary,) a letter(s) providing reasonable assur-

ance to [SKC] that the language in the AES–CB Conditions of Site Certification paragraph II.D *does not preclude [SKC] from restarting* and operating these units under a PSD permit. This condition may be waived at [SKC's] sole discretion in the event an alternate proposal is made by AES–CB to [SKC] which provides [SKC] with economics at least as favorable as operating its existing boilers.
Strauber Aff., Ex. E I.(A).

10. Indeed the complaint admits that the agreement to refire the SKC boilers was subject to state approval. Compl. ¶ 3(b).

in the Company abandoning projects. At the time of abandonment, the Company would expense all capitalized development costs incurred in connection therewith. Some of the significant risks encountered in the development of projects are as follows:

> —*Risks of Local Opposition.* AES tries to select a location for a proposed facility where local government and community groups are receptive to the construction and operation of such a plant. The Company works with community groups to improve relations, but local opposition frequently occurs based on, among other things, environmental concerns, particularly when a plant is proposed to be sited in more densely populated regions. Significant community opposition increases the risks of obtaining local permits, which can result in delays in the project's development or increased development costs and may even cause the Company to abandon a proposed site for a project.

Strauber·Aff. Ex. A at 9–10, Ex. B at 9–10.

Furthermore, once the Florida State investigation progressed to a point where it threatened Cedar Bay's Site Certification, as well as financing for the project, the increased risk to the project was disclosed. Nine days after Florida's Governor announced Special Counsel Dean's investigation, AES filed its debt prospectus which disclosed both the investigation and its possible ramifications for the Cedar Bay project as follows:

> *Possible Revocation of AES Cedar Bay Site Certification.* At the request of the Secretary of the Florida Department of Environmental Regulation ("DER"), the Governor of Florida and his cabinet authorized the Florida Attorney General's office to investigate allegations that Seminole Kraft Corporation ("Seminole Kraft"), in its joint application with AES Cedar Bay to the DER for site certification of the AES Cedar Bay facility, misled the Florida Power Plant Siting Board and the DER by failing to disclose that Seminole Kraft, contrary to its original plans to permanently shut down five boilers used by Seminole Kraft to produce energy and steam for its paper mill, intended to refurbish and seek re-permitting of three of these boilers. If the Attorney General were to determine that the allegations had merit, an administrative complaint would likely be issued seeking revocation or suspension of the site certification. The Siting Board could seek to suspend construction activities during the pendency of administrative proceedings after a preliminary hearing, or without any hearing in emergency circumstances. If a revocation or suspension order were issued, construction of the facility would have to cease.

> There can be no assurance that the project lenders to AES Cedar Bay will continue to fund construction of the facility during the course of the Attorney General's investigation or any subsequent proceedings. Furthermore, the commencement of such proceedings, if not dismissed within 60 days, would constitute an event of default under AES Cedar Bay's project loan documents, and would entitle the lenders to cease funding construction of the facility or accelerate the project loans and foreclose against the facility. If it became probable that the project lenders would accelerate the project loans and foreclose against the facility, AES would likely be required to write off its equity investment in the project (currently $8 million). In addition, AES would become liable on and would record a loss for a $1 million guaranty to the utility under the project's power sales contract if certain construction milestones were not met.

> After consultation with counsel, the Company believes that the DER and the Siting Board, in the documents they have provided and the public statements they have made, have not fully explained their position and, although the Company is unable to ascertain the precise factual basis for the allegations of misrepresentation, it believes that no material misrepresentations were made in the site certification application or proceed-

ings. Notwithstanding the foregoing, if the siting certification for the AES Cedar Bay facility were revoked· or suspended, the Company does not believe that any such revocation or suspension would be likely to have a material adverse effect on the consolidated financial condition of AES and its subsidiaries.

Strauber Aff. Ex. B at 11–12.

■ Even in the face of these substantial disclosures, plaintiffs contend that each prospectus was false or misleading because it failed to disclose that AES was guilty of fraudulently obtaining the Site Certification from the State of Florida. However, as discussed above, the letter of agreement which both plaintiffs and the State of Florida claim reveals AES's intent not to comply with the conditions of the Site Certification, in fact requires that the conditions of Site Certification be met. *See Crystal v. Foy,* 562 F.Supp. 422, 426–27 (S.D.N.Y.1983) (J. Weinfeld) (the very document upon which plaintiffs rely negates the charge of fraudulent concealment). AES could not have known, and need not have disclosed, that local officials would use the steam purchase agreement between AES and SKC to derail the Cedar Bay project. AES disclosed the· general political risks faced by co-generation projects, and when defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves. *See Luce,* 802 F.2d at 56 (liability will not be imposed when the prospectus "bespeaks caution" regarding the particular risk); *I. Meyer Pincus,* 936 F.2d at 763 (same). Therefore, plaintiffs have not alleged any material misrepresentations or omissions with regard to the Cedar Bay Facility.

### B. The Shady Point Facility

■ Plaintiffs claim as to the Shady Point Facility is that the intentional falsification of wastewater discharge reports at the plant, which began in January of 1991 and was not disclosed until June of 1992,[11] rendered the statements in the prospectuses as to AES's environmental achievements false and misleading.[12] Defendants admit that the reports were intentionally altered by AES employees but nonetheless contend that plaintiffs fail to allege any material misrepresentations or omissions pertaining to the Shady Point Facility in· support of their claims under section 11, section 12(2) and Rule 10b–5.

Defendants contend that every statement in each prospectus pertaining to either AES's commitment to ethical and environmental values, or its environmental achievements, are statements of opinion or belief. They point to *Virginia Bankshares,* —— U.S. at ——, 111 S.Ct. at 2756–59, which held that statements of opinion or belief are only false or misleading if the plaintiff shows that defendants did not honestly hold the opinions expressed. Further defendants argue that because the complaint does not sufficiently allege that AES's management knew that AES employees were intentionally falsifying wastewater reports, it fails to claim that AES did not hold the opinions or beliefs expressed in the prospectuses. *See Buchman v. Primerica Corp.,* 1992 WL 27290, *3 (S.D.N.Y. 1992) (since complaint failed to allege parent corporation's knowledge of its partially owned subsidiary's illegal scheme, the parent's failure to· disclose the scheme did not render its statements of opinion and belief actionable).

While the prospectuses do contain statements of opinion and belief which extol AES's environmental commitment, the complaint also quotes statements of fact from the prospectuses as to AES's environmental record:

> The company has been a leader in environmental matters associated with independent power production.

---

11. Defendants argue that statements in its June 23, 1992, press release indicate that AES's management had no knowledge of the intentionally falsified reports prior to their disclosure. Defendants conclude that we should therefore dismiss the claims as to the Shady Point Facility. To grant defendants' argument we would not only have to consider these press releases, but also assume the truth of the matters asserted therein, which we may not do pursuant to this motion to dismiss.

12. The complaint also objects to AES's Form 10–Q and 10–K filings in 1991 and the 1991 annual report. Compl. ¶ 100.

The AES facilities have established high standards of operation. During 1990 and the first quarter of 1991, on average, these facilities have recorded emissions at levels considerably below those allowable under environmental permits, and have had a safety record better than the average for the electricity generating industry.

AES monitors applicable environmental standards and evaluates the selection of technologies to ensure that the applicable standards will be met.

Compl. ¶¶ 46, 48; Debt Prospectus at 5, 26, 47; Equity Prospectus at 5, 26, 51. To extend the holding in *Virginia Bankshares* beyond statements of opinion and belief and apply it to these statements of fact would be tantamount to reading a scienter requirement into sections 11 and 12(2) which is contrary to the text of these statutes. The gist of the complaint is that these statements in the prospectuses are rendered false or misleading by the failure to disclose the degree to which AES's environmental record had been obtained by falsifying wastewater reports at the Shady Point Facility. *See In Re Pharmaceutical, Inc. Sec. Litig.,* 733 F.Supp. 668, 677 (S.D.N.Y.1990) (undisclosed bribery scheme rendered corporate statements false and misleading); *cf. United Paperworkers Int'l Union v. International Paper Co.,* 985 F.2d 1190, 1198 (2d Cir.1993) (in the proxy context a company's actual environmental record material in assessing company's statements as to its environmental commitment). Thus, material misrepresentations and omissions are alleged to support the securities violations alleged.

 Defendants make an additional argument that the Rule 10b–5 claim should be dismissed because plaintiffs have not alleged facts which, if proven, would support a finding that AES made these misrepresenta-

tions with scienter.[13] Although scienter need not be pled with particularity under Rule 9(b), Fed.R.Civ.P., the complaint must state facts which give rise to a "strong inference" of fraudulent intent. *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990). The complaint alleges, and defendants concede, that employees of AES were intentionally filing these false reports before, during, and after the two public offerings in question and that AES omitted this fact from the prospectuses. We find that these allegations sufficiently establish an inference of AES's intent to defraud investors. AES argues that those responsible for the fraud were low level employees and the complaint does not allege facts which show that AES's management knew, or was reckless in its ignorance, of the intentionally falsified records. However, the facts that show which AES officials knew, or recklessly failed to learn, of the fraud being perpetrated by AES employees upon environmental regulatory bodies cannot be ascertained by plaintiffs without discovery and therefore, need not be alleged in the complaint.[14] *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) (plaintiff need not allege "facts peculiarly within the opposing parties knowledge"). The allegations that AES failed to disclose the intentional actions of its employees and that this omission rendered statements in the prospectuses false and misleading are sufficient to state a 10b–5 claim. *See Robbins v. Moore Medical Corp.,* 788 F.Supp. 179, 190–91 (S.D.N.Y.1992) (Rule 9(b) motion denied because plaintiffs alleged, in general terms, facts supporting scienter that they could not be expected to know with specificity at the pleading stage); *but see Buchman,* 1992 WL 27290, *3.

## C. The Bucksport Facility

 Plaintiffs claim that representations in the prospectuses as to the Bucksport Fa-

---

13. Defendants only contend that the complaint does not sufficiently allege scienter against AES, and they do not contest whether the facts sufficient to support scienter as to each individual defendant are alleged.

14. Defendants cite *Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), in which the court upheld a dismissal of a Rule 10b–5 claim under Rule 9(b). However, *Ross* dealt with the timeliness with which a corporation disclosed that one of its products was unsafe, and the complaint did not state plaintiffs' basis for alleging defendants' knowledge that the product was unsafe. In the instant case, it is undisputed that AES employees knew of the falsified reports, and we will not require plaintiffs' to make a greater showing without the benefit of discovery.

cility were false or misleading in two respects. First, AES failed to disclose the added risk to the project caused by the fact that the electricity to be generated was not needed by utilities within the State of Maine. Compl. ¶ 64(a) & (b). Second, the prospectuses did not reveal that transmission of power to utilities outside of Maine was either unfeasible or so costly as to materially undercut the profitability of the project. Compl. ¶ 64(c) & (d). The complaint quotes the following disclosures made in the equity prospectus as to the Bucksport Facility:

> AES Harriman Cove, Inc., a wholly-owned subsidiary of AES, is developing a 180–megawatt coal-fired co-generation facility in Bucksport, Maine. Dispatchable power sales contracts have been entered into between AES Riverside, Inc., another development subsidiary of AES, and Boston Edison Company, Inc. ("Boston Edison") and New England Power Company ("NEPCO") pursuant to which each such utility has agreed to purchase 45% of the electricity produced by the project.... NEPCO has stated that the Bucksport project does not meet the requirements of the power sales contract because the facility originally was to have been developed at a different location. If NEPCO were to terminate the power sales contract on this basis, AES would be liable under a letter of credit reimbursement agreement in the amount of $80,000 and would continue to develop this site while seeking a new utility customer. Discussions are underway with other utilities for the purchase of the remaining 10% of electrical output. Significant community interest in the environmental permitting process has been encountered in this project (both in opposition and in support). The project's initial application to the Bucksport Planning Board for a shoreland zoning permit was denied, and an amended application has been refiled. No material permits have

> yet been obtained. In the event the plant does not commence commercial operations by January 1, 1993, AES would be liable to NEPCO under the power sales contract for up to $800,000. If commercial operations at the plant do not commence by August 16, 1995, AES would also be liable to Boston Edison for up to $1 million under the terms of its power sales contract. AES supports its current potential obligations to NEPCO and Boston Edison with letters of credit which aggregated $1.2 million as of May 31, 1991.[15]

Compl. ¶ 63.

Plaintiffs contend that these statements were misleading because AES failed to disclose that it had originally promoted the project to the Bucksport community and the EPA as necessary to meet Maine's power needs, and that subsequently two Maine utility companies saw no present or future need for electricity from the facility. Plaintiffs claim that this fact was material to AES investors because Maine's future need for power was a substantial factor to be considered by the EPA in determining whether to approve the project. Defendants contest the materiality of this omission given their disclosure that no permits had yet been obtained for the facility.

■ The Court may only rule on the materiality of an omission when reasonable minds could not differ on the importance of the information to the reasonable investor, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). We cannot find, as a matter of law, that this undisclosed risk in obtaining the necessary permits for the project would be immaterial to the reasonable investor.[16]

Plaintiffs next contend that the statements in the prospectuses as to the contracts with NEPCO and Boston Edison, quoted above, were false and misleading. The complaint

---

15. A similar statement appears in the debt prospectus. Compl. ¶ 65.

16. Defendants also assert that the only federal permit required to operate the facility was a National Pollutant Discharge Elimination System permit ("NPDES permit"), and that the "need" for power within a state need not be shown to

obtain such a permit. However, at this stage in the litigation we cannot determine the validity of this argument. If defendants can show that need for power within the State of Maine was indeed irrelevant to obtaining all the permits required to operate the plant, they may do so via a motion for summary judgment.

states that the agreements to sell power to New England utilities were contingent upon AES obtaining "wheeling" agreements with local Maine utilities to transfer the power to the purchasers and that these wheeling agreements were, themselves, contingent on approval by an agency called NEPOOL. Plaintiffs contend that AES failed to disclose that NEPOOL had preliminarily determined that such wheeling was unfeasible because it would negatively affect the service provided by local Maine utilities. In the alternative, plaintiffs contend that even if the transmission of power from the Bucksport Facility to its potential customers was possible, AES failed to disclose that the cost of such transmission would be so high that it would undercut the profitability of the facility.

Defendants argue that the NEPOOL findings were not material because they were preliminary. Defendants fail to cite any authority that supports the conclusion that preliminary findings of a permitting agency are as a matter of law immaterial; as stated above, we must leave to the jury all materiality questions on which reasonable minds might differ. Defendants also argue that they were not required to peer into the future to predict the profitability of a plant which had not yet been, and might never be, constructed. However, given the significant disclosures as to the sales contracts with NEPCO and Boston Edison, if the costs of delivering power to these customers were prohibitively high, it might be found that AES had the obligation to disclose this fact to its investors.

Along with the allegations discussed above, which the plaintiffs make as to the representations in both prospectuses, the complaint alleges that additional statements in the debt prospectus as to the Bucksport Facility were false or misleading. The complaint quotes the debt prospectus as follows:

The project's initial application to the Bucksport Planning Board for a shoreland zoning permit was denied; however, a permit was granted following submittal of a new application in 1991. On February 11, 1992, the Bucksport Zoning Board of Appeals overturned the decision granting the shoreland zoning permit. AES intends to file an action challenging this decision in the Maine Superior Court. Other material permits have yet to be obtained. In the event AES does not begin delivering electricity under this contract by January 1, 1993, AES would be liable to NEPCO under the power sales contract for up to $800,000. If commercial operations do not commence by August 16, 1995, AES would also be liable to Boston Edison for up to $1 million under the terms of its power sales contract. AES supports its current potential obligations to NEPCO and Boston Edison with letters of credit which aggregated $1.5 million as of December 31, 1991.

Compl. ¶ 65. Plaintiffs allege that these statements were false or misleading because AES failed to disclose that the company and the EPA had halted all efforts towards obtaining EPA approval of the facility, and that AES had refused to fund a study which was necessary before Maine utilities could agree to transmit the electricity generated by the Bucksport Facility out of the state. Compl. ¶ 66.

Defendants again argue that their significant disclosures as to the problems being experienced by the proposed Bucksport Facility should insulate them from liability with regard to the omissions alleged. *Luce,* 802 F.2d at 56 (no liability for statements that clearly "bespeak caution"). However, defendants misapply the "bespeak caution" doctrine set out in *Luce. Luce* stands for the proposition that projections, forecasts, and predictions in a registration statement that are not realized will not create liability if the statements are seasoned with warnings of the risks of the endeavor. *See Id.* (statements as to "potential" cash and tax benefits not misleading when prospectus warned that actual results may differ from projections); *I. Meyer Pincus,* 936 F.2d at 762–63 (statement that shares were "expected" to sell at a premium or a discount not misleading because prospectus warned that shares frequently trade at a discount); *see generally, In re Donald J. Trump Casino Sec. Litig.,* 793 F.Supp. 543, 549–554 (D.N.J.1992) (discussing the "bespeaks caution" doctrine). Plaintiffs' allegations are not controlled by these cases. The complaint states that, while

there were significant disclosures as to some risks facing the proposed Bucksport Facility, AES failed to disclose other risks facing the project. Thus, the disclosures in the prospectuses do not insulate AES, as a matter of law, from liability for the alleged omissions. It may be that the disclosures made were substantial enough to render those undisclosed risks unimportant to the reasonable investor and thus, immaterial, but this is a matter for the jury and cannot be resolved on a motion to dismiss.

In sum, we find that the complaint alleges omissions of material fact at the Shady Point and Bucksport Facilities which, if proven, can support plaintiffs' claim that the prospectuses contained false and misleading statements of material fact.

## II. The Section 11 and 12(2) Claims

■ Defendants additionally argue that the claims rooted in the Securities Act of 1933 should be dismissed because plaintiffs fail to set out a sufficient connection between their securities purchases and the offering documents at issue.[17] The complaint alleges that plaintiffs either acquired their AES securities in AES's public offerings or that their purchases were "traceable" to the public offerings. Compl. ¶¶ 109, 114. Defendants argue that since section 11 and 12(2) claims cannot arise from trades in the secondary market, this latter allegation fails to establish any claim under the Securities Act of 1933. We are unpersuaded by defendants' argument and therefore, deny their motion.

■ To state a claim under section 11, plaintiffs must allege that their stock was issued pursuant to a defective public offering, and under section 12(2), they must claim that their stock was issued pursuant to a false or misleading prospectus. *Ackerman v. Clinical Data, Inc.,* 1985 WL 1884, *1–*2 (S.D.N.Y.1985); *Klein v. Computer Devices, Inc.,* 591 F.Supp. 270, 273, 277–78, 278 n. 19 (S.D.N.Y.1984); *Bernstein v. Crazy Eddie,*

*Inc.,* 702 F.Supp. 962, 972–73 (E.D.N.Y.1988); *see Barnes v. Osofsky,* 373 F.2d 269 (2d Cir.1967). Claims under each section may be brought by persons who purchased shares "traceable" to the public offering. The Second Circuit in *Barnes,* 373 F.2d 269, upheld a settlement agreement in a section 11 claim which compensated all of the plaintiffs who purchased securities "traceable" to the public offerings at issue, and created a springboard for courts in this circuit to read the traceability requirement into claims under both sections 11 and 12(2). *Klein,* 591 F.Supp. at 272–73, 273 n. 7, 277–78, 278 n. 19; *Bernstein,* 702 F.Supp. at 972–73; *see Lorber v. Beebe,* 407 F.Supp. 279, 285–287 (S.D.N.Y. 1975) (section 11 claim dismissed because plaintiffs could not show that they purchased "new" stock traceable to the public offering); *In re Lilco Sec. Litig.,* 111 F.R.D. 663, 671 (E.D.N.Y.1986) (the question under section 11 is whether the plaintiffs stock may be traced to "old" or "new" stock); *Unicorn Field, Inc. v. Cannon Group, Inc.,* 60 F.R.D. 217, 226 (S.D.N.Y.1973) ("it is now well settled in this Circuit that § 11 ... permits recovery only by purchasers of shares covered by the defective registration statement or by those who can trace their purchases directly to such shares"); *see generally, Colonial Realty Corp. v. Brunswick Corp.,* 257 F.Supp. 875 (S.D.N.Y.1966). Since plaintiffs have alleged that their securities were purchased in AES's public offerings or were traceable to the public offerings at issue, they have standing to bring these claims under sections 11 and 12(2). *In re Crazy Eddie Sec. Litig.,* 747 F.Supp. 850, 854–55 (E.D.N.Y.1990) (general allegations that the plaintiffs' securities were traceable to the public offering sufficient to state a claim for violations of sections 11 and 12(2)).

■ Defendants cite numerous cases where courts refused to extend section 12(2) to cover aftermarket trading and claim that the reasoning in these cases is equally applicable to claims under sections 11 and 12(2).

17. Defendants also argue that section 11 and section 12(2) are aimed only at false statements in the offering documents and therefore, misstatements which are not connected to the offering documents can not support these claims against them. Underwriter Def's Br. in Sup. at

5. Plaintiffs concede this point and agree that their section 11 and 12(2) claims are based solely on the alleged false and misleading statements and omissions in the offering documents. Pl's Br. in Opp. to Underwriter Def's at 18–19.

*See e.g., Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 693 (3rd. Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).[18] The circuit courts which have spoken on this matter and cases within this district are divided on the question whether section 12(2) should be extended to secondary market transactions, although the weight of authority from this district points towards limiting the scope of section 12(2). *Compare Ballay*, 925 F.2d 682 (section 12(2) does not apply to aftermarket transactions); *McCowan*, 1989 WL 38354, *2 (same); *Strong*, 700 F.Supp. at 5 (same); *and SSH Co.*, 678 F.Supp. at 1059 (same) *with Pacific Dunlop Holdings, Inc. v. Allen & Co. Inc.*, 1993 WL 145748 (7th Cir.1993) (extending section 12(2) to aftermarket transactions) *and Farley v. Baird, Patrick & Co., Inc.*, 750 F.Supp. 1209, 1219 (S.D.N.Y.1990) (same); *see Barnes*, 373 F.2d at 272 (in dicta) ("both § 12(2) and 17 .. are not limited to the newly registered securities."). However, every case cited by defendants arose in the context of claims based on trades with no nexus whatever to a public offering, and the courts in these cases were persuaded not to extend section 12(2) to aftermarket transactions, in part because they found that the Securities Act of 1933 was intended to regulate public offerings. *See e.g., Ballay*, 925 F.2d at 689–691. Plaintiffs' in the instant case allege that their purchases were either

made pursuant to the offerings or, at a minimum, traceable to them. Defendants cite no case in which a court dismissed claims alleging violations of sections 11 and 12(2) despite plaintiffs' claim that their stock purchases were "traceable" to a public offering.[19] As this discussion indicates, precedent in this circuit supports the finding that plaintiffs who allege that their securities purchases are traceable to a public offering have standing to sue under sections 11 and 12(2), and therefore, unlike the cases cited by defendants, the fact that the Securities Act of 1933 was intended to regulate public offerings does not compel us to dismiss these section 11 and 12(2) claims. *Cf. Fujisawa Pharmaceutical Co. v. Kapoor*, 814 F.Supp. 720, 729 (N.D.Ill. 1993) (because the same concerns arose as in an initial offering, section 12(2) claim upheld although plaintiffs' trades were technically in the secondary market).[20]

## CONCLUSION

For the foregoing reasons defendants' motion is granted only as to plaintiffs' claims relating to the Cedar Bay Facility; the remainder of defendants' motion is denied.

SO ORDERED.

---

**18.** Among the cases that defendants cite in support of this proposition are *McCowan v. Dean Witter Reynolds Inc.*, 1989 WL 38354, *2 (S.D.N.Y.), *appeal dismissed*, 889 F.2d 451 (2d Cir.1989); *Strong v. Paine Webber, Inc.*, 700 F.Supp. 4, 5 (S.D.N.Y.1988); *SSH Co., Ltd. v. Shearson Lehman Bros. Inc.*, 678 F.Supp. 1055, 1059 (S.D.N.Y.1987); *Mix v. E.F. Hutton & Co., Inc.*, 720 F.Supp. 8, 11 (D.D.C.1989); *Bennett v. Bally Mfg. Corp.*, 785 F.Supp. 559, 561 (D.S.C. 1992); *Bank of Denver v. Southeastern Capital Group, Inc.*, 763 F.Supp. 1552, 1558–59 (D.Colo. 1991); *Ralph v. Prudential–Bache Sec., Inc.*, 692 F.Supp. 1322, 1323–24 (S.D.Fla.1988); *First Union Brokerage v. Milos*, 717 F.Supp. 1519, 1522–23 (S.D.Fla.1989); *Leonard v. Stuart–James Co., Inc.*, 742 F.Supp. 653, 658 (N.D.Ga.1990); *Pacific Dunlop Holdings, Inc. v. Allen & Co. Inc.*, 1991 WL 348493 (N.D.Ill.1991), *rev'd*, 993 F.2d 578 (7th Cir.1993).

**19.** In addition, defendants cite *McCowan*, 1989 WL 38354, *2, *Strong*, 700 F.Supp. at 5, *SSH*, 678 F.Supp. at 1059, *Mix*, 720 F.Supp. at 11,

*Bank of Denver*, 763 F.Supp. at 1558–59, and *Bennett*, 785 F.Supp. at 561, because each held that section 12(2) does not apply to secondary market transactions. Each of these cases cites with approval this Court's decision in *Klein*, 591 F.Supp. 270, which, as discussed above, directly supports the traceability doctrine.

**20.** Defendants' argument in their initial motion papers focus solely on the cases interpreting the meaning of the phrase "by means of a prospectus or oral communication" in section 12(2). Defendants raise a new argument in their reply papers. They point out that section 12(2) only applies to "[a]ny person who ... offers or sells a security" and only allows "the person purchasing such security from him" to recover. Defendants contend that those plaintiffs who can merely trace their shares to the public offering can not state a section 12(2) claim against the underwriters because section 12(2) only creates liability against a buyer's immediate seller. Underwriter Def's Br. in Reply at 7–9. We do not reach this question because defendants have raised it in such a way as to deny plaintiffs an opportunity to respond.